In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3073

JOSE DIAZ, RAMON PEÑA, and ALBERTO ROBLES,

*Plaintiffs-Appellants,*

*v.*

KRAFT FOODS GLOBAL, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 6814—**Ronald A. Guzmán**, *Judge.*

ARGUED FEBRUARY 23, 2011—DECIDED AUGUST 8, 2011

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* After Kraft Foods announced a plan in 2008 to outsource many positions at its Tech Center located in Glenview, Illinois, it arranged for the new company to accept applications from Kraft employees who were about to lose their jobs. This case arises from the fallout of that decision. Two of the targeted employees, Jose Diaz and Ramon Peña, chose to

apply for positions with Kraft that opened up around that time, rather than pursuing employment with the new vendor. When Kraft did not hire either one, their employment with the company terminated. A third employee, Alberto Robles, stayed with Kraft, but he believes that since 2001 Kraft has paid him less than he deserves because it has never promoted him from a "grade 2" to a "grade 3" position. The plaintiffs attribute these adverse employment actions to their supervisor, Peter Michalec, who they say is biased against Hispanics. The district court concluded that the plaintiffs failed to create a triable issue on whether racial animus motivated any of Kraft's actions and granted summary judgment for the defendant. We find that the district court improperly discounted the plaintiffs' strongest evidence and erred in its legal analysis of Diaz and Peña's failure-to-hire claims, but that it properly granted summary judgment on Robles's disparate pay claim. Therefore, we reverse in part and affirm in part.

# I

Kraft prevailed on summary judgment, and so we recount the facts in the light most favorable to the plaintiffs while noting disputes where relevant. Diaz's employment at Kraft began in 1990, and for nine years he was assigned to the sanitation and janitorial departments. In 1999, Diaz transferred to the shipping department, where he worked until he lost his job on November 15, 2008. Peña began in Kraft's shipping

department as a part-time employee in 2000. In 2006, he became a full-time employee, staying in the position until he lost his job on the same day as Diaz. Peña and Diaz were hourly employees throughout their tenure with Kraft. Robles worked in the sanitation and janitorial departments as an hourly employee from 1987 to 2001. In June 2001, he became a senior technician in the support services department; this was the salaried position that he held at the time of this appeal.

In the proceedings below, two additional plaintiffs, Betty Flores and Robert Vela, were parties to this lawsuit. Flores defeated Kraft's motion for summary judgment and eventually settled her claim. Vela has not appealed. As will soon become clear, the evidence Flores marshaled to defeat Kraft's summary judgment motion remains relevant to this case.

The conduct of one Kraft supervisor, Peter Michalec, gives rise to this lawsuit. Michalec became the shipping supervisor in 2000, and starting in 2005 he also supervised the support services department. In 2008, once Kraft outsourced the shipping department where Peña and Diaz worked, Michalec became the supervisor of Pilot Plant Services, an entity comprised of the building operations group, the sanitation department, and the support services department. Michalec was in charge of hiring for the positions Diaz and Peña sought, and he had the authority to increase Robles's pay.

The plaintiffs complain that Michalec would send Flores, Diaz, and Peña outside to scrub parking lots, clean sewers, and tend to other disliked tasks "as often as

possible" during the cold winter months, but he did not assign non-Hispanic employees to similar labors. They also assert that Michalec followed the three around during the day, timing their breaks and scrutinizing their work, without subjecting non-Hispanic workers to the same treatment. Additionally, the plaintiffs identify statements made by Michalec over the years that in their view illustrate his animus against Hispanics. Robles testified that Michalec said in 1999 that he got his job because he (Michalec) was white; Michalec called Robles a "gold-digger" when he asked for a raise; Michalec said "I'm white and I'm right"; and he yelled, "Get the hell out of my office. Go die somewhere else," when Robles was having a heart attack in 2005. Carlos Casalan, another former employee, asserts that "on numerous occasions" Michalec said that he did not like Spanish people and referred to Hispanics as "dummies" and "stupid."

The real trouble, however, surfaced when Diaz and Peña tried to get different jobs at Kraft around the time of the outsourcing. Kraft has a posting process to fill available jobs that usually proceeds as follows. A manager initiates the search by sending a potential job posting to the human resources department, which, after approval, sends the posting to the talent acquisition department. Talent acquisition puts the posting on Kraft's in-house website, distributes it internally on paper, or takes both actions. On occasion, Kraft also posts a sign-up sheet to permit interested employees to indicate their interest in a position.

In July 2008, Kraft posted a sign-up sheet for a single senior technician position. Diaz, Peña, and two other Hispanic employees, along with two African-American employees, signed up to be considered for the positions. Peña also sent an application and his resume to human resources. Shortly after the sign-up sheet was posted, somebody (nobody knows who) crossed off the names of the two African-American employees, leaving only four Hispanic employees in the applicant pool. Kraft then decided to freeze the hiring for that position. According to Kraft, the company knew that out-sourcing was on the horizon and wanted to wait until the announcement was made so that more employees could apply for the position. In the plaintiffs' view, however, once Michalec saw that only Hispanics were competing for the position, he decided to halt the hiring.

In September 2008, once Kraft's plan for outsourcing was known to all, two senior technician and five sanitation positions became available. Kraft posted a notice to announce these vacancies, but it did not permit employees to indicate interest in the positions by putting their names on a sign-up sheet. Instead, Michalec created a list of interested employees and hired from that pool of candidates. Diaz and Peña accuse Michalec of refusing to let them apply for the senior technician positions, thereby eliminating the possibility that they would be hired. Kraft disputes this. It concedes that Diaz and Peña were not considered for the technician positions, but it asserts that the two men simply failed to apply. Diaz and Peña insist that this is implausible, since only two months earlier they

both signed up to apply for an almost identical position, and by September it was apparent that if they did not acquire another position with Kraft their jobs would be eliminated as a consequence of the outsourcing. They maintain that they complained to human resources that they were being shut out of the application process, but once they did so Kraft quickly filled at least one of the positions before the application period ended and before Diaz and Peña were able to get their names into the applicant pool.

Kraft ultimately hired Curtis Ward and Robert Meyers, two non-Hispanics, for the senior technician positions. Kraft concedes that none of the applicants for the senior technician positions met all of the qualifications on the posting, but it says that Ward and Meyers were the best match for the position because of their strong mechanical skills. The plaintiffs counter that the strength of Ward and Meyers's mechanical skills is irrelevant, since their complaint is that they were not even permitted to apply for the positions.

As for the sanitation positions, both Diaz and Peña were on the list of applicants compiled by Michalec. Nine employees applied for the five positions: four Hispanics, two Caucasians, and two African-Americans. Kraft says that all of the applicants were sufficiently qualified for the job, so it hired according to seniority. Based on that metric, Diaz and Peña were not selected, but two Hispanic employees with more seniority, including Betty Flores, were chosen. Diaz and Peña concede that they were lower on the seniority scale than the employees

hired, but they assert that they were more qualified and should have been hired on that basis. They emphasize that the guidelines set out in Kraft's internal hiring policy do not list seniority as a variable in hiring decisions; Kraft responds that the policy does not prohibit the company from using seniority as a factor. In October 2008, Diaz and Peña complained to human resources and other supervisors that they were not hired for either of the positions because of their race. That month, Diaz filed a charge of discrimination with the EEOC, and Peña followed suit in November.

Betty Flores, who is not a party in this appeal, complained in the proceedings below that, although she was hired for a sanitation position, Michalec discriminatorily assigned her to a night-shift position. As evidence, she pointed to a conversation she had with Michalec shortly after he made the hiring decisions. Flores described the conversation as follows:

> I told [Michalec] that I would prefer to remain on days because I was the first woman that had worked for sanitation . . . . [A]nd he told me there was nothing he could do . . . because Matt Simeon[, who received one of the day-shift positions,] is his best friend. He's white just like him, and he had a family to take care [of].

Flores also said that when she confronted Michalec about his discrimination against Latinos, he said that he did not discriminate because Latinos are a majority, not a minority. Flores does not recall when Michalec made this remark.

Robles raises a disparate pay claim. He says that when he was hired as a senior technician in the support services department in 2001, he was categorized as a salary grade 2 employee, even though the job posting he submitted his application for advertised a salary grade 3 position. According to Robles, Kraft told him that once he acquired certain skills, his salary would be increased to the grade 3 level. He quickly gained the skills necessary to earn at the higher salary level, but Kraft never increased his salary. Robles also claims that Ward and Meyers, the two men hired for the senior technician positions, are paid more than he is, even though he is supposed to train them for the job.

Kraft explains that salary grades are tied to specific positions; for Robles to get paid at a higher rate his position would have to be reclassified or he would have to apply for a vacant grade 3 position. Regrading a position, Kraft argues, is uncommon, and no grade 3 positions have become available since 2005. As for the claim that Ward and Meyers are paid at higher salary grades, Kraft says that it has a "redlining policy" that permits employees who transfer from one position to another to retain their previous salary, if it is higher, for two years. It is undisputed that Ward and Meyers were at higher salary grades before their transfers. Robles filed a charge with the EEOC in June 2008 claiming that Kraft paid him lower wages than non-Hispanic employees. This lawsuit followed.

**II**

A

The plaintiffs filed suit on November 26, 2008, asserting violations of their rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et seq.*, and 42 U.S.C. § 1981. They pursue only their Title VII claims on appeal. The district court granted summary judgment for Kraft, and so we review the decision *de novo,* taking all facts in the light most favorable to the plaintiffs. See *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010).

A plaintiff can prove discrimination under Title VII by using either the direct or the indirect method of proof. *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008). Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it "uniquely reveals" the employer's intent to discriminate. See *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). More common is circumstantial evidence, which "suggests discrimination albeit through a longer chain of inferences." *Hasan*, 552 F.3d at 527 (internal citation omitted). A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether discrimination moti-

vated the employment action. Our cases point to three categories of circumstantial evidence: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Darchak*, 580 F.3d at 631. A plaintiff need not produce evidence in each category to survive summary judgment. See *id*.

B

We begin with Diaz and Peña's claim that Kraft failed to hire them for either the sanitation or senior technician positions. They are relying exclusively on the direct method we have just described. We recognize that each plaintiff has a discrete claim in relation to each position, but since the dispositive issue for each is the same— did ethnic animus against Hispanics motivate Michalec to hire other employees instead of Diaz and Peña—we may examine the claims together. The plaintiffs contend that they have produced some evidence that falls into each category of circumstantial evidence which, taken together, would permit a jury to find in their favor.

First, the plaintiffs contend that Michalec exhibited his bias against Hispanics by assigning Flores, Diaz, and Peña to disfavored tasks such as scrubbing parking lots and cleaning sewers outside during the winter. This raises an inference of discrimination, the plaintiffs

assert, because Michalec did not assign non-Hispanic employees to these duties. Based on the record, the district court concluded that these facts *could* suggest bias. Yet the court backed off from this conclusion because Raul Fernandez, another Hispanic employee, was not assigned to the same unwanted tasks. The court reasoned that ultimately the evidence did not support an inference of discrimination because at least one Hispanic employee was not discriminated against in the same way.

We reject this line of analysis. Title VII would have little force if an employer could defeat a claim of discrimination by treating a single member of the protected class in accordance with the law. Suppose the district court's view carried the day: a female employee suffering from discrimination on the basis of her sex would have to establish that her employer discriminated against *all* women in the workplace to assert a sex discrimination claim. That, sensibly, is not how Title VII operates. Instead, "[t]he principal focus of the statute is the protection of the individual employee, rather than the protection of the minority group as a whole." *Connecticut v. Teal*, 457 U.S. 440, 453-54 (1982); *City of Los Angeles, Dep't of Water and Power v. Manhart*, 435 U.S. 702, 708-09 (1978) (recognizing that fairness to the class of women employees does not excuse discrimination against an individual female employee). Discrimination against one Hispanic employee violates the statute, no matter how well another Hispanic employee is treated. See *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). We agree with the plaintiffs that there is no token exception to anti-discrimination law. See *Teal*, 457 U.S. at 455

("Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.").

The source of the district court's error may have been a mistaken decision to import an inverted version of the "similarly situated employee" factor from the indirect method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff can raise the inference of discrimination by identifying a similarly situated employee *outside* the protected class who was treated more favorably by the employer. See, *e.g.*, *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000). There is no "similarly situated employee" analysis available to the employer to defeat a plaintiff's claim. Instead, in an indirect-proof case, to shift the burden back to the plaintiff the employer must articulate a non-discriminatory reason to explain the challenged conduct. One thing is clear under this framework: the employer cannot satisfy its burden by identifying a person *within* the protected class who was not similarly discriminated against. And in any event, Diaz and Peña are not even trying to use the burden-shifting approach. Under the direct method, the fact that Michalec treated another Hispanic worker well at most might be a piece of evidence tending to negate discrimination with respect to Diaz and Peña, but that is the precise question of intent that a jury must resolve. See *Darchak*, 580 F.3d at 632 (observing that when an employer hires someone from the protected class to fill the position the plaintiff was not awarded, the jury

must decide whether discriminatory intent motivated the hiring decision). We need not decide whether evidence that Michalec assigned Hispanic workers to disfavored tasks is enough by itself to enable the plaintiffs to survive summary judgment, since there is more.

The plaintiffs also support their claim by reference to Michalec's role in the irregular hiring processes for the sanitation and senior technician positions. In September 2008, it was Michalec who created the list of candidates for those positions; plaintiffs contend that he refused to put their names on that list. The court found that the record supported the plaintiffs' assertion, but concluded that this fact would have probative value only "if [Michalec] did not consider any Hispanics for the jobs." For the reasons discussed above, this analysis is misguided. We hold that the way that Michalec structured the hiring process for the technician positions could raise an inference of discrimination. We note, additionally, that Kraft's assertion that even if Diaz and Peña had been considered for the senior technician positions, they would not have been hired because they lacked sufficient mechanical skills, is beside the point. Under the direct method of proof, the plaintiffs are not required to rebut a defendant's non-discriminatory reason for the adverse employment action, as they must under the indirect method. Kraft may, of course, present its rationale to a jury to defeat the plaintiffs' discrimination claim, but it is insufficient to quash it at summary judgment. Thus, Diaz and Peña's claim regarding the senior technician positions should go forward.

The district court continued down its mistaken path when evaluating Diaz and Peña's contention that unlawful discrimination lay behind Kraft's decision not to hire them for the sanitation positions. The court again agreed with the plaintiffs that the hiring process deviated from the norm, but it concluded that the process did not support an inference of bias because four Hispanics were considered for the position and at least one, Flores, was hired. This, too, overlooks the fact that Diaz and Peña are raising individual disparate treatment claims, not a broad-based pattern or practice claim. In addition, the court failed properly to evaluate the comment Michalec made to Flores, stating that Matt Simeon received a day-shift sanitation position because he was "white like Michalec." As the district court found, this statement, if credited by the jury, is direct evidence that Michalec awarded the daytime position to Simeon instead of Flores based on a racial preference. On that basis alone, the court denied Kraft's motion for summary judgment on Flores's claim. Taking the perspective of Diaz and Peña's cases, the court concluded that the statement was only circumstantial evidence that could be considered in conjunction with other evidence to establish Michalec's discriminatory intent. As a general matter, that is correct. The problem this time is that in the end the district court never returned to consider the relevance of this evidence to Diaz and Peña's claim at all.

Instead, the court examined other evidence identified by the plaintiffs of racially offensive comments made by Michalec. The district court found that those state-

ments did not support an inference of bias because they were not said around the time the hiring decisions were made. We agree with the court that there must be something (such as temporal proximity) to link the racially inflected comments and the adverse employment action before a jury should be permitted to infer that discrimination motivated the action. See *Darchak*, 580 F.3d at 632 (noting "that three to four months between a remark and an employment action is not so long as to defeat the inference of causal nexus"). The court also correctly found that other non-racial but rough statements made by Michalec, such as telling Robles to get out of his office while Robles was in the throes of a heart attack, did not support an inference of discriminatory intent.

But the irrelevance of those statements does not undercut the force of the rest of the evidence, especially Michalec's statement (which we assume at this stage of the case was made) that he awarded a day-shift sanitation position to Simeon because of his race. Not only could a jury infer that Simeon got a day-shift position because he is white, as the district court concluded, but it could also conclude that he got one of the five positions for the same reason. There is enough evidence here to create a question for the trier of fact whether ethnic bias motivated Michalec's decision not to hire Diaz or Peña for the sanitation positions. Because we conclude that both Diaz and Pena's failure-to-hire claims survive summary judgment when evaluated under the direct method of proof, we need not address the indirect method.

C

Robles's case is another matter. His disparate pay claim fails under either method of proof. The crux of his argument is that Kraft hired him to a salary grade 2 position with promises for a promotion to a grade 3 position, but the promotion never materialized. As a result, Robles contends, he is paid less than deserves. At the outset, we note that the plaintiffs' brief does not clearly state whether Robles is pursuing a disparate pay or a failure-to-promote claim. In his EEOC charge and before the district court, Robles complained that Kraft paid him lower wages than non-Hispanic employees. We will evaluate Robles's claim under the disparate pay framework, but for the sake of completeness we note that his claim would fare no better if evaluated as a failure-to-promote claim.

Robles primarily relies on the evidence identified by Diaz and Peña in support of his claim, but that is a mistake. Robles filed his EEOC charge in June 2008, before Kraft announced the sanitation and senior technician vacancies. This means that the evidence supporting an inference of discrimination in relation to the hiring decisions in October and November of 2008 has no bearing on Robles's claim. See *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) ("The focus under the direct method of proof is . . . whether the evidence 'points directly' to a discriminatory reason for the employer's action."). Once that evidence is out of the picture, there is scant material remaining that "points directly" to an inference that Michalec paid Robles less than other

workers because of ethnic discrimination. Robles says that comments Michalec made to him, including calling him a gold-digger and telling him to leave the office while he was having a heart attack, evidence ethnic animosity. We disagree. Calling someone a gold-digger is offensive, and ordering someone suffering from a heart attack to leave is utterly inexplicable, but neither of these incidents establishes ethnic bias. The only remaining evidence pertains to the allegation that Michalec assigned Flores, Diaz, and Peña harsher duties, cleaning parking lots and sewers, than non-Hispanic employees. This, standing alone, is insufficient to create a triable issue on the question whether ethnic discrimination motivated Michalec to pay Robles, who worked in a different department, less than other employees.

Finally we note that the indirect method would not resuscitate Robles's claim. Robles has not identified a similarly situated employee who received better treatment. See *Ford v. Minteq Shapes and Services, Inc.*, 587 F.3d 845, 848 (7th Cir. 2009). The only plausible candidates for that comparison are Ward and Meyers, the two employees hired as senior technicians in 2008 (instead of Diaz and Peña). The sole fact that supports a finding that Ward and Meyers are similarly situated to Robles is that they are currently employed in the same position. But that is not enough, since the record shows that Ward and Meyers were getting paid at higher salary grades because of Kraft's "redlining policy," which permits employees who transfer into a position graded at a lower salary level to continue to earn the higher salary for two years. The existence of the

redlining policy demonstrates that Ward and Meyers were not "subject to the same standards" and thus were not similarly situated to Robles. See *Radue*, 219 F.3d at 618. Absent a valid comparator, Robles cannot move past summary judgment under the indirect method of proof.

Therefore, we AFFIRM the judgment of the district court granting summary judgment on Robles's claim and REVERSE the grant of summary judgment on Diaz and Peña's claims and REMAND for further proceedings.